# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 11-CV-5182

————————————

JOANNE GRAHAM,

Plaintiff,

VERSUS

THREE VILLAGE CENTRAL SCHOOL DISTRICT,

Defendant.

————————————

**MEMORANDUM AND ORDER**
September 30, 2013

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Joanne Graham ("plaintiff" or "Graham") brings this action against defendant Three Village Central School District ("defendant" or the "District") alleging employment discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"). Specifically, plaintiff alleges that: (1) defendant discriminated against plaintiff on account of her disability, by failing to accommodate plaintiff's requests for reasonable accommodation, namely, the reinstatement of the handicapped parking spaces that were moved during a period of construction; and (2) defendant retaliated against plaintiff after she engaged in the protected activity of requesting reinstatement of the former locations of the handicapped parking spaces.[1]

Defendant moves for summary judgment, arguing, *inter alia*, that (1) plaintiff's ADA claim must be dismissed because plaintiff cannot establish an ADA-qualifying disability; (2) plaintiff failed to make any requests for a reasonable accommodation, and, with respect to any issues raised by plaintiff, the District engaged in an interactive process with her and responded to all of her requests; and (3) plaintiff cannot establish a retaliation claim because she can neither set forth a prima facie case of retaliation, nor can she show that defendant's decision to terminate

_____

[1] As discussed *infra*, although it is not entirely clear whether plaintiff is continuing to assert a disability discrimination claim in connection with the termination (rather than simply a retaliatory termination claim), the Court will address that claim in an abundance of caution and concludes that it also cannot survive summary judgment.

plaintiff was pretextual.

For the reasons that follow, the Court concludes that defendant's summary judgment motion should be granted in its entirety. Specifically, the Court concludes that plaintiff's ADA failure to accommodate claim fails because plaintiff has not set forth evidence from which a rational jury could find that she has satisfied the first element of an ADA disability discrimination claim: namely, that she has an ADA-qualifying disability. The uncontroverted evidence in the record, including plaintiff's own deposition testimony, shows that plaintiff's alleged disability does not substantially limit a major life activity as compared to most people in the general population. Similarly, there is no evidence from which a rational jury could find that plaintiff had a record of impairment (and, under the amendments to the ADA, no "regarded as" claim can exist for an alleged failure to accommodate). Moreover, even assuming *arguendo* that plaintiff can satisfy the first prong, her failure-to-accommodate claim still cannot survive summary judgment because the uncontroverted evidence in the record, including plaintiff's own testimony, shows that the District was responsive to any of plaintiff's requests, both engaging in an interactive process with her and investigating and acting upon her requests, where possible. To the extent that plaintiff asserts that the District should have allowed her to park in an active construction site where no employees could park due to the safety hazards presented, no rational jury could find such a request to be reasonable. With respect to the retaliation claim, even assuming *arguendo* that plaintiff has set forth a prima facie case, defendant has proffered a legitimate, non-discriminatory reason for its termination decision – namely, a complaint from St. Charles Hospital that plaintiff had been rude and forceful with one

of their autistic students. There is nothing in the record to rebut that articulated reason; stated differently, plaintiff offers no evidence from which a rational jury could find that her requests for handicapped parking were the but-for cause of her termination. Finally, to the extent plaintiff is also asserting that her termination was due to her disability (and not just alleged retaliation), that claim fails for the same reason. In particular, even assuming *arguendo* that plaintiff can establish a prima facie case, there is insufficient evidence from which a rational jury could find that the District's articulated reason for her termination was a pretext for disability discrimination. For these reasons, the Court concludes that defendant's motion for summary judgment is granted in its entirety.

I. BACKGROUND

A. Facts

The following facts are taken from the parties' depositions, declarations, exhibits, and respective Local Rule 56.1 statements of facts.[2] Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 50 n.1 (2d Cir. 2005). For this reason, the Court construes the facts in favor of plaintiff.

1. Plaintiff's Employment in the District

Plaintiff Joanne Graham began her employment with defendant in 1987 as a Monitor in Nassakeag Elementary School. (Def.'s 56.1 ¶ 1; Pl.'s 56.1 ¶ 1.) She subsequently was promoted to the position

---

[2] Although the parties' respective Rule 56.1 Statements contain specific citations to the record, the Court cites to the Rule 56.1 Statement instead of to the underlying citation to the record.

of Tutor, a position that she held until 2008. (Def.'s 56.1 ¶ 1; Pl.'s 56.1 ¶ 1.) That year, plaintiff's title, along with that of approximately ninety other tutors in the District, was changed to Certified Teaching Assistant, or "CTA." (Def.'s 56.1 ¶ 2; Pl.'s 56.1 ¶ 2.) This change in title placed plaintiff (along with the other CTAs) on a tenure track; it also gave her a three-year probationary period of employment. (Def.'s 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.) Plaintiff had not been eligible for tenure prior to her change in title. (Def.'s 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.) Plaintiff understood the significance of being placed on a tenure track: she would have to be observed, and at the end of her probationary period (and based on those observations), she would either receive or be denied tenure. (Def.'s 56.1 ¶ 4.) Plaintiff had the choice of starting her new position either on February 1, 2008 or on September 1, 2008. (*Id.* ¶ 5.) She chose the February 1, 2008 date, making her officially eligible for tenure as of February 1, 2011, assuming all expectations were met. (*Id.*)

In her role as a CTA, plaintiff worked one-on-one with special education students. (*Id.* ¶ 6.) She also had job coaching responsibilities, which included taking students off school premises and into the community to learn job skills at certain accepted locations. (*Id.* ¶ 7.)

### 2. Plaintiff's Alleged Disability

Plaintiff describes herself as being disabled as of 1983, prior to her time of employment with the District. (*Id.* ¶ 9.) She broke her hip after falling during a roller skating accident. (*Id.*) Plaintiff had surgeries on her hip and subsequently was cleared for rehabilitation, and therefore, for other exercises with no limitations on her activity abilities. (*Id.* ¶ 9; Pl.'s 56.1 ¶ 9.) Four years later, plaintiff began her employment with the District. (Def.'s 56.1 ¶ 10.) Although

defendant describes plaintiff's condition at the commencement of her employment as "fine" and "healed" (Def.'s 56.1 ¶ 10), plaintiff claims that she had "limited mobility" at that time, given that compression screws had been inserted into her hip (Pl.'s 56.1 ¶ 10).

Although it is not clear what the exact extent of plaintiff's alleged disability was at the time her employment with the District began, what is clear is that plaintiff had a handicapped-parking sticker. (Def.'s 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.) On commencing her employment, plaintiff did not explicitly inform anyone that she was disabled. (Def.'s 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.) She also made no accommodation requests at that time; plaintiff contends this was so because a handicapped-parking spot was available to her then. (Def.'s 56.1 ¶ 12; Pl.'s 56.1 ¶ 12.)

Thus, plaintiff began her employment with the District. From the inception of her employment, plaintiff's hip injury did not impede or affect her abilities to perform her job with the District, provided that – as plaintiff notes – she had access to a handicapped-parking spot. (Def.'s 56.1 ¶ 13; Pl.'s 56.1 ¶ 13.) From approximately 1987 until 1999, plaintiff had no health conditions or injuries that affected her ability to perform her job. (Def.'s 56.1 ¶ 14.) Moreover, plaintiff did not request any accommodations during this time or make any job-related requests for assistance. (*Id.*)

During the 1998-1999 school year, plaintiff sustained an injury at work that caused her to miss approximately two months of work: she was knocked down by a student running in the halls. (*Id.* ¶ 15.) She thereafter returned to work, as well as to her prior normal job activities and functions. (*Id.* ¶ 16.) Although defendant claims that plaintiff did not make any requests for accommodations after the hallway incident,

plaintiff notes that this was due to the fact that she still had access to her handicapped parking spot during this time, and that without such an accommodation, her work environment might have become "extremely hazardous to her health." (Pl.'s 56.1 ¶¶ 13; 16; *see also* Def.'s 56.1 ¶ 16.)

In 2009, plaintiff suffered another injury: she "bounced off a rather large woman" in a crowded hallway and fell down. (Def.'s 56.1 ¶ 17; Pl.'s 56.1 ¶ 17.) Plaintiff was taken to the hospital and deemed to have suffered contusions and abrasions; she missed approximately a day or so of school. (Def.'s 56.1 ¶ 17; Pl.'s 56.1 ¶ 17.) On returning to work, plaintiff also returned to her previous job responsibilities and was able to participate in her normal activities and functions. (Def.'s 56.1 ¶ 18; Pl.'s 56.1 ¶ 18.) Plaintiff notes, however, that this was all subject to the fact that she had no need to request an accommodation, given that she still had access to a handicapped-parking spot during this time. (Pl.'s 56.1 ¶¶ 12, 13, 18.)

In approximately the fall of 2010, plaintiff sustained another injury. (*Id.* ¶ 19; Def.'s 56.1 ¶ 19.) She tripped on a piece of lumber in the school parking lot and was taken to the hospital. (Def.'s 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.) Plaintiff was diagnosed with contusions and "whatever" to her head. (Def.'s 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.) Approximately a day or two later, she was back at school, having returned to her normal work functions and activities. (Def.'s 56.1 ¶ 20; Pl.'s 56.1 ¶ 20.) Defendant notes that plaintiff made no requests for accommodations at this time. (Def.'s 56.1 ¶ 20.)

### 3.  Construction at the School

In March 2009, construction began to expand the school's (already large) size,[3] which made a section of the parking lot inaccessible. (Def.'s 56.1 ¶ 23; Pl.'s 56.1 ¶ 23.) Indeed, the school building was so large that it did not have a single entrance; instead, it had approximately ten entrances to the building. (Def.'s 56.1 ¶ 24; Pl.'s 56.1 ¶ 24.) In addition to multiple entrances, the school also had multiple parking lots. (Def.'s 56.1 ¶ 25; Pl.'s 56.1 ¶ 25.) Parking was located on both the north and south side of the building, as well as by the front office; there also was a large parking lot at the rear of the building, where the senior students holding driving privileges typically parked their vehicles. (Def.'s 56.1 ¶ 25; Pl.'s 56.1 ¶¶ 25, 27.) The closer spots, generally located on the north and south side of the building, were designated for faculty and staff. (Def.'s 56.1 ¶ 25; Pl.'s 56.1 ¶ 25.)

Before construction began, plaintiff generally parked in the handicapped spots located on the south side of the school. (Def.'s 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.) These spots were particularly convenient for plaintiff because her first class was located near that area. (Def.'s 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.) Pre-construction, plaintiff did not have any problems obtaining a parking spot in the morning on arriving at work. (Def.'s 56.1 ¶ 28; Pl.'s 56.1 ¶ 28.) Things changed, though, when construction began. With the entire campus being renovated, space in and around the building changed, including the construction of a new science building on the south side of campus, as well as an entire reconstruction of the south parking lot area. (Def.'s 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.) The

---

[3] The high school – Ward Melville, specifically – is estimated by the parties to have between approximately 1,000 to 2,000 students. (Def.'s 56.1 ¶ 24.)

impact of this was noted in the parking arrangements available at the school; the new buildings required a relocation of parking areas, as well as a redirection of traffic flow. (Def.'s 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.) Part of the parking affected by this rearrangement of spaces was the handicapped parking spots. (Def.'s 56.1 ¶¶ 29, 30; Pl.'s 56.1 ¶¶ 29, 30.)

John Grillo ("Grillo") was the architect hired to oversee the construction at the school. (Def.'s 56.1 ¶ 30; Pl.'s 56.1 ¶ 30.) His responsibilities included determining where the handicapped parking would be relocated to, as well as how many handicapped parking spaces would be available to drivers. (Def.'s 56.1 ¶ 30; Pl.'s 56.1 ¶ 30.) It was determined that the handicapped spaces located on the south side of the building (*i.e.*, in plaintiff's preferred parking location) needed to be moved as the new building was to be constructed where the old spaces were located. (Def.'s 56.1 ¶ 31; Pl.'s 56.1 ¶ 31.) The spaces were moved to just outside the construction fence. (Def.'s 56.1 ¶ 31; Pl.'s 56.1 ¶ 31.)

On the first day of construction, plaintiff arrived at school and asked a security guard where the handicapped parking spaces were located. (Def.'s 56.1 ¶ 32; Pl.'s 56.1 ¶ 32.) The guard informed her that he did not know and instructed her to park in the first available spot that she saw. (Def.'s 56.1 ¶ 32; Pl.'s 56.1 ¶ 32.) Plaintiff did so; she did not try parking in one of the designated handicapped spots located on the other side of the building, supposedly because of their far distance from the building's entrance. (Def.'s 56.1 ¶¶ 32, 33; Pl.'s 56.1 ¶¶ 32, 33.) Although it is unclear whether plaintiff complained that first day that the changes to the handicapped spot parking locations were implemented, it seems that sometime during that first week, she raised complaints

concerning the parking situation. (Def.'s 56.1 ¶ 32; Pl.'s 56.1 ¶ 32.)

Soon thereafter, plaintiff approached school principal Alan Baum ("Baum"), informing him that there were no handicapped spaces on the south side of the building. (Def.'s 56.1 ¶ 34; Pl.'s 56.1 ¶ 34.) Baum referred plaintiff to Mike Owen ("Owen"), the then Assistant Principal, who also was in charge of the construction project. (Def.'s 56.1 ¶ 34; Pl.'s 56.1 ¶ 34.) Plaintiff claims that she specifically informed Owen that she needed access to a parking spot closer to the building entrance because if she fell, she might sustain a serious injury. (Def.'s 56.1 ¶¶ 35, 42; Pl.'s 56.1 ¶¶ 35, 42.)

Plaintiff continued to approach Baum with concerns as to the handicapped parking situation, like the number of spaces available and their proximity to the building, during the construction period. (*See* Def.'s Summ. J. Mot. Ex. C at 79-81; *id.* Ex. E at 23-24.) Plaintiff also subsequently complained of persons parking in the handicapped spots because the spaces' lines were obscured by snow, and of signs being needed in order to clearly designate those spots that were for handicapped parking. (Def.'s 56.1 ¶ 40; Pl.'s 56.1 ¶ 40.) The same day in which plaintiff complained as to the lack of signage, the District had signs put up. (*See* Def.'s 56.1 ¶ 40; Pl.'s 56.1 ¶ 40.) Plaintiff also complained to Baum that a security guard had asked her to move her car, which was parked in a handicapped space, during this time period. (*See* Def.'s 56.1 ¶ 41; Pl.'s 56.1 ¶ 41.)

According to plaintiff, she had "perhaps a couple" of conversations with Assistant Principal Baum concerning the parking situation. (*See* Def.'s 56.1 ¶ 42; Pl.'s 56.1 ¶ 42.) Whenever she did, plaintiff claims that Baum would refer the particular

matter to another individual, typically, Owen or Grillo. (Def.'s 56.1 ¶ 36; Pl.'s 56.1 ¶¶ 36.) Plaintiff describes these referrals a bit more colorfully: her complaints were "always [being] shoved off to somebody else." (Pl.'s 56.1 ¶ 36.) According to plaintiff, tensions arose between Baum and herself. In particular, in the summer of 2010, plaintiff alleges that Baum screamed at her and made an obscene arm gesture when she came to him expressing her handicapped parking concerns. (*Id.* ¶ 36.)

Sometime during the time frame in which plaintiff was complaining about the parking spaces, Baum had a conversation with Grillo. (Def.'s 56.1 ¶ 38; Pl.'s 56.1 ¶ 38.) This conversation confirmed that the parking lot during the construction period met the requirements for handicapped parking spaces, and also, that there were no other alternatives for placement of the spaces, given the construction operation and the need to try and place the spaces as close to the entrance ways as possible. (Def.'s 56.1 ¶ 38.) Owen similarly checked in with the construction management firm on a near daily basis to ensure that the construction project was impacting the school's day-to-day operations as little as possible. (*See id.*)

Defendant claims that plaintiff did not inform Baum or Owen that she needed a handicapped parking spot so that she could perform her job. (*See* Pl.'s 56.1 ¶ 35.) Additionally, plaintiff does not dispute that she never put any of her complaints concerning the parking situation into writing. (*Id.*; Pl.'s 56.1 ¶ 43.) Although she did not put her complaints into writing, it seems that at least on one occasion, plaintiff took matters into her own hands, cutting the ribbons blocking off the handicapped spaces in the construction area, or making her own space next to the handicapped spots. (Def.'s 56.1 ¶ 44; Pl.'s 56.1 ¶ 44.) Plaintiff was not formally disciplined for this practice,

although Owen allegedly chastised her on one occasion for creating her own space. (Def.'s 56.1 ¶ 44; Pl.'s 56.1 ¶ 44.)

Mary Castiglie ("Castiglie"), the other Assistant Principal (who was not working at the school at that time), was not made aware of any issues concerning the handicapped parking spaces during the 2009 construction period. (Def.'s 56.1 ¶ 45; Pl.'s 56.1 ¶ 45.) She was never advised as to plaintiff's complaints, and by the time she returned to the school for the 2010-2011 school year, the construction was complete. (Def.'s 56.1 ¶ 45; Pl.'s 56.1 ¶ 45.)

#### 4. Complaints Concerning Plaintiff's Performance and the District's Tenure Decision

On approximately October 28, 2010, the District removed plaintiff from her job coaching responsibilities on account of a complaint from St. Charles' Hospital, one of the locations in which plaintiff worked with students. (*See* Def.'s 56.1 ¶¶ 46, 48; Def.'s Summ. J. Mot. at 6-7.) The complainant had no affiliation with the District, nor did she have any knowledge of plaintiff's alleged disabilities. (*See* Def.'s 56.1 ¶ 46.) According to the complaint, plaintiff had been "rude and forceful in giving directions to the student that she was working with." (*Id.* ¶ 48.) Plaintiff allegedly had contended that the student needed to be spoken to in this way because they were on a time limit; the student was "low-functioning and possibly autistic." (*Id.* ¶ 49.) The staff was not pleased with plaintiff's handling of the matter and reported the incident to their supervisor, who in turn reported the incident to Carol Nickerson ("Nickerson"), one of plaintiff's supervisors at the District and the job coach coordinator. (*Id.* ¶¶ 47-48.) Although plaintiff asserts that Nickerson "laughed at the absurdity of the complaint" (Pl.'s 56.1 ¶ 48), whatever her reaction

might have been, it seems clear that Nickerson reported the complaint to Patricia Fore ("Fore"), the special education chairperson, who then reported it to Assistant Principal Castiglie. (*Id.* ¶ 48.) Castiglie investigated the complaint, speaking with the supervisor from St. Charles, who essentially gave Castiglie the same information concerning plaintiff's handling of the incident, as well as staff members' reactions to plaintiff's alleged mistreatment of the student. (Def.'s 56.1 ¶ 50.) Castiglie also was informed that plaintiff had been rude to the supervisor when she was asked why she was not wearing a hair net or apron while working in the kitchen. (*Id.*)

On acquiring this information, Castiglie went to Baum, who also performed an investigation concerning the complaint. (*Id.* ¶ 51.) Meanwhile, Castiglie spoke with plaintiff, who explained – as she had to the St. Charles Hospital supervisor – that this was the manner in which that particular student needed to be spoken to. (*Id.*) Plaintiff's framing of this incident echoes a similar sentiment, as she states that her "directness towards the autistic student was necessary and proper" (Pl.'s 56.1 ¶ 48), and that she "was direct with this student because he was autistic, and this was the proper approach to take with a student with autism" (*id.* ¶ 49). On completing its investigation, the District determined that inappropriate conduct had taken place, and it removed plaintiff from her job coaching responsibilities. (Def.'s 56.1 ¶ 51.) On being removed from her job coaching responsibilities, plaintiff was reassigned to the library, where she continued to receive her same salary and benefits. (*Id.* ¶ 52.) According to plaintiff, the prestige associated with her library responsibilities was not "comparable to her prior duties." (Pl.'s 56.1 ¶ 52.)

According to defendant, Baum treated this complaint concerning plaintiff and the autistic student very seriously, particularly given that it occurred right around the time in which plaintiff was up for tenure. (Def.'s 56.1 ¶ 53.) As previously set forth, plaintiff was working on a three-year probationary period. During this time, the probationary employee is observed by immediate supervisors and given annual evaluations. (*Id.* ¶ 54.)[4] When the three-year period comes to an end, recommendations are sent to the human resources office regarding those employees who should – or should not, as the case may be – receive tenure. (*Id.*) The human resources department will then share these recommendations with the school superintendent, who will then review the recommendations and discuss them with his or her cabinet. (*Id.*) Following this consideration period, the superintendent may then decide to recommend tenure, deny tenure, or recommend an extension of a given employee's probationary period to the Board of Education. (*Id.*)

As plaintiff's three-year probationary period drew to a close, her candidacy for tenure was presented to the superintendent and his cabinet. (*Id.* ¶ 55; *see also* Pl.'s 56.1 ¶ 55.) In reviewing plaintiff's file, the superintendent and cabinet considered the

---

[4] According to plaintiff, on September 17, 2010, she received a memorandum indicating that two tenure observations would be conducted before the rendering of any CTA tenure decisions. (Compl. ¶ 28.) These observations were to be performed by Castiglie and Fore. (*Id.* ¶ 29.) Plaintiff claims that she did not undergo the type of tenure observations as were represented in the September 2010 letter. In particular, plaintiff claims that one of her observations occurred on School Spirit Day, when regular course work was not conducted; thus, Castiglie's observation consisted of nothing more than watching plaintiff grade papers. (*Id.*) Plaintiff claims that no other observations of her were ever done. (*Id.*)

St. Charles Hospital complaint, as well as another incident in plaintiff's file concerning a classroom teacher, which occurred sometime in 2005. (Def.'s 56.1 ¶ 55; *see also* Def.'s Summ. J. Mot. Ex. E at 52-53; *id.* Ex. N.) On considering plaintiff's work history, record, recommendations, evaluations, as well as the aforementioned complaints, the superintendent – as well as Baum – were of the position that plaintiff should not be awarded tenure. (Def.'s 56.1 ¶ 56.) The decision being made, Baum decided to personally give plaintiff the news. (*Id.* ¶ 57.) In November 2010, Baum had plaintiff attend a meeting in his office, which was also attended by Assistant Principal Castiglie, a union representative, and "possibly the special education chairperson Patti Fore." (*Id.*) Subsequent to the meeting, plaintiff received a letter – also in November 2010 – informing her that the superintendent did not plan to recommend her for tenure. (*Id.* ¶ 58.) She similarly was informed that her termination date would be effective January 28, 2011. (*Id.*) Plaintiff was not alone – other CTAs, who also had been on a probationary period – were advised that they would not be receiving tenure, either. (Def.'s 56.1 ¶ 59; Pl.'s 56.1 ¶ 59.)

On November 17, 2010, plaintiff asked the District for an explanation as to its proposed action. (Def.'s 56.1 ¶ 60; Pl.'s 56.1 ¶ 60.) On November 22, 2010, the District sent plaintiff a letter citing excessive absences, a failure to work well with staff, and an improper execution of job coaching responsibilities in support of its decision to deny tenure. (Def.'s 56.1 ¶ 60; Pl.'s 56.1 ¶ 60.) Unsatisfied with this explanation, plaintiff requested a meeting with the superintendent; although she was unable to meet with the superintendent, plaintiff was able to meet with then Assistant Superintendent Cheryl Pedisich ("Pedisich"). (Def.'s 56.1 ¶ 61; Pl.'s 56.1

¶ 61.) At this meeting, plaintiff and Pedisich discussed all that had transpired, including plaintiff's complaints concerning the lack of handicapped parking. (Def.'s 56.1 ¶ 61; Pl.'s 56.1 ¶ 61.) Although defendant contends that plaintiff did not inform Pedisich that she thought she was being discriminated against on account of her disability (Def.'s 56.1 ¶ 61), plaintiff claims that she "explicitly told Pedisich that she felt she was being terminated because she had complained about the lack of handicapped parking" (Pl.'s 56.1 ¶ 61). Sometime following this meeting, plaintiff was given the option of resigning from her position, instead of being terminated; she declined this option. (*Id.* ¶ 62.) On December 14, 2010, the Board of Education approved the superintendent's recommendation to terminate plaintiff's employment at the end of her probationary period. (Def.'s 56.1 ¶ 63.) Ten other CTAs at the District also were terminated at the end of their respective probationary periods. (*Id.* ¶ 64.)

### 5. The District's Awareness of Plaintiff's Disability and the EEOC Complaint

It is undisputed that plaintiff did not file any internal complaints about any alleged discrimination she suffered during her employment. (Def.'s 56.1 ¶ 71; Pl.'s 56.1 ¶ 71.) Although the District had a policy, which included a complaint procedure, prohibiting discrimination based on impermissible considerations (like a disability), plaintiff claims that she was unaware of this policy at all times prior to this dispute. (Def.'s 56.1. ¶ 70; Pl.'s 56.1 ¶ 70.)

Multiple District employees contend that they were unaware of plaintiff's alleged disability until the filing of this lawsuit. (*See* Def.'s 56.1 ¶¶ 65-68 (stating that Castiglie, Baum, Owen, and Fore lacked any

knowledge concerning plaintiff's disability, but that they were aware that she parked in handicapped parking spaces).)

On approximately March 25, 2011, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), receiving a notice of right to sue on July 28, 2011. (Def.'s 56.1 ¶ 74; Pl.'s 56.1 ¶ 74.) This action followed.

## B. Procedural History

Plaintiff filed her complaint in this action on October 25, 2011. Defendant answered her complaint on December 15, 2011. On November 16, 2012, defendant submitted a letter requesting a pre-motion conference in anticipation of moving for summary judgment. The Court granted defendant's request and held a pre-motion conference on December 5, 2012. During the conference, the Court set a briefing schedule for defendant's summary judgment motion. On January 22, 2013, defendant submitted its motion for summary judgment. Plaintiff filed her opposition papers on April 10, 2013, and defendant submitted its reply on May 3, 2013. Oral argument was held on June 19, 2013. This matter is fully submitted.

## II. STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LCC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of

showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (citation and internal quotation marks omitted); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d. Cir. 2002) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, '[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id*. at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.

1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

### III. DISCUSSION

Defendant raises the following challenges to plaintiff's allegations. First, defendant contends that plaintiff does not have an ADA-qualifying disability. Second, defendant asserts that plaintiff cannot establish a failure-to-accommodate claim. In particular, defendant argues that plaintiff never requested accommodations, but when she raised various concerns, defendant always engaged in an interactive process with her, fully addressing her respective issues. Lastly, defendant contends that plaintiff cannot establish a prima facie case of retaliation, and even if she can, that defendant has set forth a legitimate, non-discriminatory reason for its termination decision, which plaintiff cannot show was pretextual. The Court considers each claim in turn, after first summarizing the applicable law.

### A.  ADA Failure to Accommodate Claim

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). It is the plaintiff who "bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination." *Heyman v. Queen Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999); *see also Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 383 (2d Cir. 1996) ("A plaintiff who raises a disability discrimination claim bears the initial burden of establishing a prima facie case.").

With respect to a claim under the ADA for failure to accommodate, an employer may be liable if it "fails to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is . . . an employee.'" *Cody v. Cnty. of Nassau*, 577 F. Supp. 2d 623, 643 (E.D.N.Y. 2008) (quoting *Sussle v. Sirina Protection Sys. Corp.*, 269 F. Supp. 2d 285, 312 (S.D.N.Y. 2003)). "A plaintiff can state a claim for discrimination based upon an employer's failure to accommodate her disability by alleging facts showing: (1) that she has a disability within the meaning of the [ADA]; (2) that the defendants, who are covered by the ADA, had notice of her disability; (3) that with reasonable accommodations she could perform the essential functions of the position sought; and (4) that defendant refused to make such accommodations." *Feeley v. N.Y.C. Police Dep't*, No. 97-CV-02891-RJD, 2001 WL 34835239, at *9 (E.D.N.Y. Sept. 4, 2001). Once a plaintiff has set forth a prima facie case, "the burden shifts to the employer to demonstrate that the employee's proposed accommodation would result in an undue hardship." *Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352, 360 (E.D.N.Y. 2012). For the following reasons, plaintiff's accommodation claim cannot survive summary judgment.

In this case, the parties do not dispute that the District constitutes an employer subject to the ADA. Instead, defendant argues that plaintiff's failure to accommodate claim cannot survive summary judgment because there is no

evidence that the plaintiff was disabled within the meaning of the ADA and further, there is no evidence that defendant failed to make a reasonable accommodation for any alleged disability. As set forth below, the Court agrees and concludes that, even construing the evidence most favorably to defendant, no rational jury could find that plaintiff was disabled or had a record of disability for purposes of this claim. The Court also concludes, even assuming *arguendo* that plaintiff could meet that requirement, that no rational jury could find that defendant failed to make a reasonable accommodation, given the uncontroverted facts in this case.

### 1. Whether Plaintiff Has an ADA-Qualifying Disability

The ADA Amendment Act of 2008 ("ADAAA"), effective January 1, 2009, altered the analysis for assessing ADA-disability claims, "substantially broaden[ing] the definition of a disability under the law, in explicit response to *Sutton v. United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002), in which the ADA's terms defining disability had been strictly defined." *Green v. DGG Properties Co., Inc.*, No. 11-CV-1989 (VLB), 2013 WL 395484, at *9 (D. Conn. Jan. 31, 2013) (citation and internal quotation marks omitted); *see also Kravtsov v. Town of Greenburgh*, No. 10-CV-3142(CS), 2012 WL 2719663, at *10 (S.D.N.Y. July 9, 2012) ("In enacting the ADA, Congress intended to provide broad coverage for individuals with disabilities, and in enacting the ADAAA in 2008, rejected Supreme Court precedent in *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002), as interpreting the term 'substantially limits' to require a greater degree of limitation than was intended." (alteration, citation, and internal quotation marks omitted)). Thus, "[w]hile the terms of

the statute were not changed, the interpretation of those terms was modified." *Brtalik v. S. Huntington Union Free Sch. Dist.*, No. CV-10-0010, 2010 WL 3958430, at *7 (E.D.N.Y. Oct. 6, 2010). Pursuant to this definition, an asserted "disability" will "be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of the chapter." 42 U.S.C. § 12102(4).

Because the contested events at issue occurred subsequent to the effective date of the ADAAA, the statute governs here. *Cf. McCowan v. HSBC Bank USA, N.A.*, 689 F. Supp. 2d 390, 398 (E.D.N.Y. 2010) ("[T]his Court and other courts have stated that the ADAAA does not apply to conduct that occurred prior to the effective date of the statute."). Accordingly, although the parties brief their arguments under the previous standard for disability claims, the Court applies the newer standard.[5]

The ADAAA defines "disability" as:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(1).

In this case, plaintiff claims that she has a disability as defined under each of the

---

[5] Although the Court applies the post-ADAAA standard, it cites some pre-ADAAA cases where the analysis contained therein is illustrative, even under the more liberal ADAAA standard.

ADA's three prongs. (*See* Pl.'s Opp'n at 7.)[6] However, the ADAAA now makes clear that no failure to accommodate claim can be made, as a matter of law, for an individual who was "regarded as" disabled, rather than who was actually disabled. In other words, the "regarded as" theory of disability is no longer actionable in the context of a failure to accommodate claim. *See* 42 U.S.C. § 12201(h) ("A covered entity under subchapter I, a public entity under subchapter II, and any person who owns, leases (or leases to), or operates a place of public accommodation under subchapter III, need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of this title solely under subparagraph (C) of such section."); *see also Powers v. USF Holland, Inc.*, 667 F.3d 815, 823 n.7 (7th Cir. 2011) ("[T]he ADAAA clarified that an individual 'regarded as' disabled (as opposed to actually disabled) is not entitled to a 'reasonable accommodation." (quoting 42 U.S.C. § 12201(h))). Thus, this Court only addresses, for purposes of plaintiff's failure to accommodate claim, whether there is evidence from which a rational jury could find that plaintiff was disabled or had a record of disability.

### a. Whether Plaintiff Has a Physical Impairment that Affects a Major Life Activity

For a plaintiff to establish that she has a disability under the statute's first subsection, she must "(1) show that [she] suffers from a physical or mental impairment, (2) identify the activity claimed to be impaired and establish that it constitutes a major life activity, and (3) show that [her] impairment substantially limits the major life activity previously identified." *Green*, 2013 WL 395484, at *9 (quoting *Kravtsov*, 2012 WL 2719663, at *10) (internal quotation marks omitted).

Significantly, the ADAAA enlarged the three-category definition of "disability," clarifying (and broadening) that which constitutes a "major life activity" under the amended legal framework. *See* Pub. L. No. 110-325, § 4(a), 122 Stat. 3553 (2008); *see also Wilkins v. J.C. Penney Corp., Inc.*, No. 11-CV-989(VLB), 2013 WL 3816588, at *6 n.1 (D. Conn. July 22, 2013) (noting the ADAAA's expansion of the ADA's three-category disability definition); *Shah v. Eclipsys Corp.*, No. 08-CV-2528 (JFB)(WDW), 2010 WL 2710618, at *6 & n.5 (E.D.N.Y. July 7, 2010). Thus, post-ADAAA, major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2). Major life activities also may include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* Notably, post-ADAAA, "major life activities no longer need to be of 'central importance.'" *D'Entremont v. Atlas Health Care Linen Servs., Co.*, No. 12-CV-0060 (LEK/RFT), 2013 WL 998040, at *6 (N.D.N.Y. Mar. 13, 2013) (quoting *Sam-Sekur v. Whitmore Grp., Ltd.*, No. 11-CV-4938, 2012 WL 2244325, at *6 (E.D.N.Y.

---

[6] As noted previously, the parties' arguments appear to have been briefed under the previous ADA standard. For simplicity's sake, the Court refers to the newer standard in its discussion of the applicable law and parties' positions.

June 15, 2012)); *see also* 42 U.S.C. § 12102(2)(A).

The ADA does not set forth a definition for what constitutes a substantial limitation. *See Kravtsov*, 2012 WL 2719663, at *10 (stating that "[t]he ADA does not define the term 'substantially limited,' but post-ADAAA regulations" clarify the term). However, post-enactment of the ADAAA, it is clear that the standard "is not meant to be [] demanding," 29 C.F.R. § 1630.2(j)(1)(i), and "should not demand extensive analysis," *id.* 1630.2(j)(1)(iii). Thus, an impairment will be considered a disability under the statute "if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." *Risco v. McHugh*, 868 F. Supp. 2d 75, 108 (S.D.N.Y. 2012) (quoting 29 C.F.R. § 1630.2(j1)(1)(ii)) (internal quotation marks omitted). An impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Kravtsov*, 2012 WL 2719663, at *10 (quoting 29 C.F.R. § 1630.2(j)(1)(ii)) (internal quotation marks omitted); *see also Brandon v. O'Mara*, No. 10-CV-5174(RJH), 2011 WL 4478492, at *7 (S.D.N.Y. Sept. 28, 2011) ("[T]he revised EEOC regulations provide that '[a]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population[; t]hat is, while [a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting, . . . the substantially limits analysis is comparative." (second and fourth alterations in original) (citation and internal quotation marks omitted)).

Plaintiff's claimed disability here is the injury to her hip, which she first sustained in 1983 and which she claims limited her mobility. Defendant argues that there is no evidence that plaintiff's alleged impairment substantially limits a major life activity. (*See* Def.'s Mot. for Summ. J. at 13 (noting that simply having an impairment does not make one disabled for purposes of the ADA, but rather, if that impairment substantially limits a major life activity, and arguing that plaintiff has not shown that she has an impairment "that substantially limits one or more of her major life activity")); *see also id.* at 14-16 (limiting argument to whether plaintiff's alleged impairment substantially prevents her from engaging in major life activities).)

The alleged major life activities that plaintiff contends her claimed disability interfered with include "performing manual tasks, walking, standing, lifting, and bending." (Def.'s Mot. for Summ. J. Ex. A ¶ 53.) However, plaintiff has failed to show that her alleged physical impairment *substantially limits* this activity when compared to most people in the general population. For instance, although plaintiff claims to have had difficulty walking or performing tasks at work, both her deposition testimony, as well as the uncontroverted evidence in the record, indicates to the contrary:

Q: [In 1987] [w]ere you able to walk?

A: Yes . . .

Q: Did your job include walking or moving about the school building?

A: Yes, it did.

Q: Were you able to do that without difficulty?

A: Yes.

(Pl.'s Opp'n Ex. 1, at 50.)

\* \* \*

Q: Did you recall if you returned to school during that 1998/1999 school year?

A: Yes, I did.

Q: At the time you returned, were you able to walk?

A: Yes.

(*Id.* at 55.)

Moreover, after each of plaintiff's on-the-job injuries, she was able to walk without difficulty and perform all of her normal job function upon her return to work:

Q: How, if at all, did the prior injury to your hip affect your ability to do your job in 1987?

A: I don't think it hampered my ability whatsoever.

(Pl.'s Opp'n Ex. 1, at 49.)

\* \* \*

Q: From 1987 up until 1999, did you have any conditions or injuries that affected your ability to do your job at Three Village?

A: No.

(*Id.* at 51.)

\* \* \*

Q: Were there any functions of your job that you had done before you were injured [during the 1998-1999 school year] that you weren't able to do after you were injured?

A: No.

(*Id.* at 55.)

\* \* \*

Q: When you returned to work following [the 2009] incident, was there any aspect of your job that you were not able to perform without modification or change to it?

A: No.

(*Id.* at 62.)

Q: When you returned to work [after the third school injury in fall 2010] were you able to resume all your normal job responsibilities?

A: I was . . .

(*Id.* at 66-67.)

\* \* \*

Q: Were there any times during your time with Three Village that you weren't able to do your job because of your disabilities?

A: Only the times that I was hurt and they took me away by ambulance. I couldn't finish out the days.

Q: Other than those times, the times that you reported to work and completed the workdays, were there any times during

those times that you weren't able to do your job because of your disabilities?

A: No.

(*Id.* at 124-25.)

Additionally, plaintiff testified that she did not need any accommodations in order to perform her normal job functions, whether pre or post the alleged injuries. (*See, e.g.*, Pl.'s Opp'n Ex. 1, at 50 ("Q: Upon starting at Three Village in 1987, did you request any special accommodations for your workplace? A: I didn't need to, so no."); *id.* at 52 ("Q: During that 12 or 13 year period from the time you started, up until [the] 1999 incident, did you make any special requests from the District for accommodations or advise them in any way you needed certain things to do your job? A: No.); *id.* at 55 (Q: [Post 1999 accident][d]id you make any special requests for consideration or accommodation from the District when you returned to work? A: None that I can think about."); *id.* at 62 (referring to 2009 incident and stating: "Q: Did you request any accommodations from the District as a result of this incident? A: No.); *id.* at 67 (referring to fall 2010 injury and stating: "Q: Did you request any accommodations as a result of your injuries? A: I did not.").)

Thus, plaintiff's own testimony confirms that her alleged physical impairment did not substantially limit the asserted major life activities of walking, standing, bending, lifting, or performing manual tasks; it did not affect her ability to perform her normal job functions; and it did not require plaintiff to make any accommodation requests. Although plaintiff contends this is not so in her opposition motion, asserting that she "needed a handicapped parking space providing a safe pathway from the parking lot to her building

entrance" at all times relevant to this dispute, this is not sufficient for purposes of establishing an impairment that substantially limits her abilities as compared to most people in the general population, particularly given that plaintiff concedes she was able to walk around the school building throughout the day without difficulty or hindrance to her abilities to perform her work functions. (*See* Pl.'s Opp'n at 9.) The most plaintiff's testimony shows is that she could not perform such tasks as horseback riding, skiing, ice skating, running, or roller-skating. (*See* Pl.'s Opp'n Ex. 1, at 49.) These, however, do not constitute major life activities under the ADAAA, nor were these activities ones in which she had to engage as part of her job responsibilities as a CTA. Those major life activities that plaintiff claims were substantially impaired by her alleged disability – namely, walking, standing, bending, and performing manual tasks – are directly countered by her own testimony, which confirms that she was able to walk, do normal work functions, and even drive to school without any assistance required.

When comparing her alleged condition to that of most members of the general population, the Court finds it difficult to decipher a distinguishable limitation here. That is, plaintiff seems to have been able to perform all of her alleged major life activities with little to no restriction. While the revised ADAAA standard broadens the definition of a disability, it does not relinquish plaintiff of having to show a limitation of some sort; *i.e.*, while the alleged impairment "need not prevent, or significantly or severely restrict," an individual's ability to perform a major life activity, a plaintiff still must show that the alleged impairment substantially limits a major life activity when compared to others. *See Brandon*, 2011 WL 4478492, at *7 ("While Congress undoubtedly intended to

broaden the scope of the ADA beyond the boundaries recognized in *Toyota*, it remains the case that 'not every impairment will constitute a disability . . . .'" (quoting 29 C.F.R. § 1630.2(j)(1)(ii))). Here, by her own words, plaintiff acknowledges that she has been able to perform the identified major life activities without issue; therefore, it is difficult – if not impossible – for the Court to determine whether or how plaintiff's alleged impairment limited her abilities to perform these acts "as compared to most people in the general population." *See id.* (quoting 29 C.F.R. § 1630.2(j)(1)(ii)).

Finally, not only does plaintiff's own testimony contradict her assertion that she suffers from a disability under the ADAAA definition, but plaintiff has not provided any other evidence – medical or otherwise – that without a handicapped parking spot, she would not be able to perform the identified impacted major life activities, or suggesting – at the least – that her ability to perform such functions was "substantially limited" when compared to the general population. For these reasons, the Court concludes that plaintiff has failed to produce evidence from which a rational jury could conclude that her alleged impairment with respect to a major life activity was substantially limiting. Accordingly, even construing the evidence most favorably to plaintiff, she cannot demonstrate a disability under subsection one of the ADAAA. *See generally Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 645 (2d Cir. 1998); *see also Curtis v. Humana Military Healthcare Servs., Inc.*, No. 10-5614, 448 F. App'x 578, 581 (6th Cir. 2011) (affirming summary judgment on claim that employer's refusal to provide a closer parking space was a failure to provide a reasonable accommodation; noting that "[t]he record here shows that [plaintiff] walked from his car to work almost every day . . . . [Plaintiff] fell only once while walking to his workplace and, on that

occasion, he fell while attempting to avoid being struck by a vehicle[; f]inally, as the district court noted, [plaintiff] has not presented any medical opinions supporting a disability under the Act[, and w]e agree with the district court's analysis that [plaintiff] has not presented sufficient evidence to allow a reasonable juror to find a 'substantial limitation' on [plaintiff's] ability to walk"); *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 951-52 (7th Cir. 2000) (finding that physical ailment of arthritis, which limited plaintiff's rate and pace of walking, was insufficient to rise to the level of an ADA-qualifying disability); *Weber v. Strippit*, 186 F.3d 907, 914 (8th Cir. 1999) (stating that a plaintiff who had "difficulty walking long distances or climbing stairs without getting fatigued" only suffered from "moderate limitations on major life activities [which] d[id] not suffice to constitute a 'disability' under the ADA"); *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1025 (5th Cir. 1999) (fact that plaintiff walked with a limp, walked slower than the average person, and had difficulty walking in extreme cold, was not sufficient to satisfy the first subsection of an ADA disability claim); *Kelly v. Drexel Univ.*, 94 F.3d 102, 106 (3d Cir. 1996) (finding physical ailment of a limp, which required plaintiff to walk slowly and prevented her from walking more than one mile, was not sufficient for purposes of establishing an ADA-qualifying disability under first subsection); *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 312 (S.D.N.Y. 2003) (stating that "[t]he 'inability to walk long distances or to climb stairs does not in itself substantially limit' an individual's ability to perform a major life activity (quoting *Stewart v. Weast*, 228 F. Supp. 2d 660, 662 (D. Md. 2002))).

b. The "Record" of a Disability Prong

Even if a plaintiff cannot show a substantial limitation of a major life activity,

she still may be able to establish an ADA-qualifying disability if she can show "a record" of such an impairment. *See* 42 U.S.C. § 12102(1)(B). The EEOC previously stated that this "part of the definition is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment. The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities." *Colwell*, 158 F.3d at 645 (quoting 29 C.F.R. pt. 1630 App., § 1630.2(k)) (emphasis added). In other words, "a record reflecting a plaintiff's classification as disabled for other purposes or other standards is not enough." *Id.*[7]

Plaintiff contends that she satisfies this subsection of the statute's definition of a disability because she suffered three on-the-job injuries, which required medical treatment and hospitalization, as well as the filing of internal accident reports with defendant. (*See* Pl.'s Opp'n at 9.) Additionally, plaintiff asserts that she filed worker's compensation claims for each injury. (*Id.*) Lastly, plaintiff states that she held a handicapped parking permit throughout her period of employment with defendant, and that defendant knew of this permit. For these reasons, plaintiff asserts that her "disability and surrounding frailty has been well documented." (*Id.*)

To begin with, the fact that plaintiff had a handicapped parking permit is not sufficient, in and of itself, to establish that plaintiff has a record of an impairment that qualifies as an ADA-disability. *See Cody*, 577 F. Supp. 2d at 642; *see also Howard v. Wal-Mart Stores, Inc.*, No. 05-CV-250, 2005 WL 2861107, at *2 (N.D. Ohio Nov. 1, 2005) ("The fact [ ] that Plaintiff drives a car with . . . a [handicapped] sticker . . . does not reveal that he suffers from an ADA protected disability . . . ."); *Robinson v. Hoover Enters. LLC*, 03-CV-2565 (TWT), 2004 WL 2792057, at *5 (N.D. Ga. Oct. 20, 2004) ("Certification or diagnosis of a disability for purposes of a [handicapped] parking permit falls short of the exacting standards of qualifying as disabled under the ADA.").

Additionally, the Court notes that plaintiff cites to no documentation in the record confirming her alleged filing of accident reports or worker's compensation claims, other than her own testimony. (*See* Pl.'s Opp'n at 9 (citing to 56.1 Statement and own deposition testimony)); *see also Jeffries v. Verizon*, No. 10-CV-2686(JFB)(AKT), 2012 WL 4344197, at *10 (stating that "[d]istrict courts in the Second Circuit have repeatedly held that a plaintiff's personal testimony which describes the alleged limits that affect a major life activity, without supporting medical testimony, simply is not sufficient to establish his prima facie case under the ADA" (alteration in original) (quoting *Sussle*, 269 F. Supp. 2d at 301) (internal quotation marks omitted)); *Cody*, 577 F. Supp. 2d at 642 (concluding that plaintiff's "record of impairment" claim fails, in part, because plaintiff "offers no evidence to support a finding that she has a record of an impairment that substantially limits a major life activity," and that "the only statement offered by plaintiff that even addresses this argument is contained in the affidavit of her counsel").

---

[7] Most recently, "the EEOC has expressed its view that the 'record' of a disability does not depend on whether an employer *relied on* a record in making an employment decision," but instead, better relates to the employer's "knowledge of an individual's past substantially limiting impairment" and "whether the employer engaged in discrimination." *Behringer v. Lavelle Sch. For Blind*, No. 08-CV-4899(JGK), 2010 WL 5158644, at *10 & n.10 (S.D.N.Y. Dec. 17, 2010) (emphasis added).

In any event, even if plaintiff had provided such materials, records of hospitalization or other medical treatment do not *per se* establish a record of an ADA-qualifying disability; rather, the evidence must establish a physical impairment that substantially impaired a major life activity. *See, e.g., Colwell*, 158 F.3d at 645 (record of previous hospital stay did not, by itself, constitute a record of impairment); *see also Dupre v. Charter Behavioral Health Sys. of Lafayette, Inc.*, 242 F.3d 610, 615 (5th Cir. 2001) (health screening form, which indicated that new employee was under the care of physician and had undergone surgery, did not show that plaintiff's impairment substantially limited any major life activity, and therefore, was insufficient as a record of disability); *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1229-30 (11th Cir. 1999) (employer record that employee missed work following a heart attack and in the following years did not establish that the employee had a record of disability); *Dicara v. Conn. Rivers Council*, 663 F. Supp. 2d 85, 93 (D. Conn. 2009) (noting that the fact that employee underwent surgery and was hospitalized was insufficient to create a record of a substantially limiting impairment).

In this case, even construing the record in plaintiff's favor and crediting her description of these alleged records of impairment, her claim still cannot survive summary judgment. Again, her alleged impairment involves no greater degree of limitation on major life activities than those impairments previously considered and rejected *supra*. Stated differently, accepting plaintiff's description of these documents' contents as true, these records simply reflect a physical impairment, in and of itself; they do not show that the impairment substantially limited her in major life activities, which is the key component to establishing a disability claim. *See Schapiro*

*v. N.Y.C. Dep't of Health*, 25 F. App'x 57, 61 n.2 (2d Cir. 2001) (considering plaintiff's argument that "the documents contained in his employee file, including the complaints, grievances, records, and Worker's Compensation Board findings, constitute a record of impairment sufficient to meet the definition of disability"; noting that "[i]n order to establish a substantial limitation, [the court] must conduct the same analysis of the effect of the impairment on [plaintiff's alleged physical impairments] as reflected in those records"; and concluding that "[w]hile these may establish a record of the physical impairment, they do not establish a record that the physical impairment created a substantial limitation"). That is, plaintiff's asserted records of impairment – which the Court has been unable to review, but of which the Court accepts plaintiff's description – simply confirm that she was injured three times on the job, which caused her to miss work, but that she had no other limitations on her ability to perform major life activities prior or subsequent to her alleged injuries. Indeed, according to her own testimony, plaintiff confirms that she was able to return to work and perform her same normal job functions, including walking, without having to request any accommodations from the District following her on-the-job injuries and filing of workers compensation claims. This is insufficient for purposes of establishing a record of impairment. *See Sam-Sekur*, 2012 WL 2244325, at *7 n.4 (applying post-ADAAA disability standard and concluding that plaintiff had not established a record of an impairment because she did "not sufficiently allege an impairment that substantially limited a major life activity under 42 U.S.C. § 12102(1)(A), and plaintiff does not allege that there were records relied on by her employer indicating a greater degree of limitation than she alleged in her

complaint"). Accordingly, even construing the evidence most favorably to plaintiff, no rational jury could find that plaintiff had a record of impairment, particularly where the alleged records demonstrate no greater degree of impairment than that already considered and rejected.

*   *   *

In sum, plaintiff has failed to set forth any evidence from which a rational jury could find that she has a physical impairment that substantially limits a major life activity as compared to the general population, or a record of such an impairment. Accordingly, plaintiff's ADA reasonable accommodation claim fails as a matter of law.

### 2. Alleged Failure to Accommodate[8]

The Court's analysis of plaintiff's failure to accommodate claim may properly end here, as plaintiff has failed the first requirement of such a claim. *See Cody*, 577 F. Supp. 2d at 643 (concluding that because plaintiff had failed to show she had an ADA-qualifying disability under her disability discrimination claim, her reasonable accommodation claim could not prevail). However, the Court, in an abundance of caution, will address the parties' other arguments concerning her reasonable accommodation claim. In particular, even assuming *arguendo* that there was sufficient evidence from which plaintiff could establish that she has a disability within the meaning of the ADA, no rational jury could find that defendant

failed to provide plaintiff with a reasonable accommodation.

Pursuant to the second requirement of a reasonable accommodation claim, plaintiff must show that defendant had notice of plaintiff's disability. The most notice that plaintiff points to here consists of the following: she had a handicapped parking sticker, she commonly parked in a handicapped parking spot, and at least one District employee noticed that she walked with a limp. Regarding the handicapped parking sticker and parking space, as previously set forth, the law is clear that a handicapped parking permit is not sufficient, standing alone, to give an entity knowledge of an ADA-qualifying disability. *See Cody*, 577 F. Supp. 2d at 642 (citing *Howard*, 2005 WL 2861107, at *2); *Robinson*, 2004 WL 279205, at *5. Similarly, the fact that an individual has a visible limp or type of walking impairment does not *per se* establish an ADA-qualifying disability. *See, e.g., Kelly*, 94 F.3d at 105 (plaintiff with severe post-traumatic hip impairment, who was unable to walk more than a mile, could not jog, and who had to use a hand rail to ascend stairs, did not have an ADA-qualifying disability by virtue of such evidence); *Penny v. United Parcel Serv.*, 128 F.3d 408, 416 (6th Cir. 1997) (plaintiff who had an impairment of less than 20% of his body and who had difficulty walking did not have an ADA-disability); *Ricardson v. William Powell Co.*, No. C-1-93-528, 1994 WL 760695, at *7 (S.D. Ohio Nov. 10, 1994) (a severe arthritis that caused a noticeable limp and difficulty climbing stairs did not constitute an ADA-qualifying disability).

Although the fact that plaintiff walked with a limp and parked in a handicapped parking space certainly might have alerted the District that plaintiff had some form of an ailment that was not shared by others,

---

[8] Although the overwhelming majority of plaintiff's referenced accommodation requests sound more of a complaint regarding parking inconveniences than of an accommodation request, the Court views the record in plaintiff's favor and construes her parking space requests as requests for accommodation.

there is absolutely no evidence that the District was on notice of a *disability*. This is particularly so in light of the fact that whenever plaintiff complained to the District concerning the handicapped spaces, she did not refer to herself as disabled, describe her condition as one that prevented or impeded her from performing or completing her job functions, or otherwise make clear to the District the alleged severity of her physical impairment. (*See* Pl.'s Opp'n Ex. 1, at 104 ("Q: Did you discuss with [the Assistant Principal] your particular disabilities and how this impacted you? A: Yes. I told him that I needed the closest accessible entrance. Q: What did you tell him about your disability or disabilities? A: That I needed a safe pathway from where I parked my car to the doorway. Q: Did you ever tell Mr. Owen the particular disabilities that you were suffering from? A: Yes. I told him that if I should fall just the right way, I could lose my leg.").) The most plaintiff seems to have established in her complaints and requests to the District is that she needed a safe pathway between her parking space and the building, and that should she fall a certain way, she might severely injure herself. The Court fails to see how this situation, however, is unique to plaintiff – the same concern might be said of any school employee who might be walking to and from the parking area, and who, for whatever reason, might take a bad tumble and fall. The Court disagrees with plaintiff's contention that such requests for a handicapped spot or raising of concerns regarding clear, safe pathways were sufficient for purposes of providing the District with notice of a disability.

Even if the Court were to conclude, however, that plaintiff had shown that the District had notice of her alleged disability, plaintiff's reasonable accommodation claim still fails because plaintiff does not show that, even if reasonable accommodations

were needed in order for her to complete her essential job functions (which, based on plaintiff's own testimony, seems clear was not, in fact, the case),[9] defendant did not provide her with such.

Specifically, plaintiff testified that any requests she ever made to the District concerning her alleged disability were, in fact, honored. (*See Id.* at 126 ("Q: Were there any requests that you made to the District for assistance or accommodation with respect to disabilities that were not honored? A: No.").) A review of the record reveals the same.

For instance, when plaintiff asked Baum (during construction) about the absence of handicapped parking spaces on the building's south side, he directed her to

_____

[9] It is well established that in order for a plaintiff to state a failure to reasonably accommodate claim, she must show that she could perform the essential functions of her job with or without reasonable accommodation. *Scalera*, 848 F. Supp. 2d at 363 ("A plaintiff who brings an action under the ADA for failure to make reasonable accommodations must establish that he or she can perform the essential functions of the job, either unaided or with the assistance of a reasonable accommodation."); *see also* 42 U.S.C. § 12111(8). Regarding this argument, defendant does not appear to dispute that plaintiff was able to perform her essential job functions at all times relevant to this dispute. Indeed, if anything, defendant takes the opposite position, contending that plaintiff, with or without her handicapped parking spot, was able to effectively perform her normal job functions. Moreover, plaintiff repeatedly testified that her abilities to perform her job functions were not affected or impaired by her alleged disability or on-the-job injuries. (*See, e.g.*, Pl.'s Opp'n Ex. 1 at 49, 51, 55, 62, 67, 124-25.) Additionally, plaintiff testified that she did not need any accommodations in order to perform her normal job functions, whether pre or post her alleged on-the-job injuries. (*See, e.g.*, *id.* at 50; *id.* at 52; *id.* at 55; *id.* at 62; *id.* at 67.) Thus, the Court, construing the allegations in plaintiff's favor, accepts that plaintiff could perform her essential job functions with her alleged physical impairment for purposes of her failure to reasonably accommodate claim.

Owen, who was in charge of the construction project. Owen took steps to address plaintiff's inquiries. In particular, Owen's conversations with Grillo, the District's architect (which plaintiff does not dispute occurred on an almost daily basis (*see* Pl.'s 56.1 ¶ 37)), confirmed that the parking lot met the requirements for handicapped spaces during the construction, that there was no alternative in terms of the handicapped spots' location, and that the spots were located as close to the entrance doors as possible. (*See* Def.'s 56.1 ¶¶ 34-38.) On a subsequent occasion, when plaintiff complained to Baum about persons improperly parking in handicapped spots because the spaces' lines had become obscured by snow and bore no other designations, the District had signs put up that same day identifying the spaces as handicapped parking. (*See* Def.'s 56.1 ¶ 40; Pl.'s 56.1 ¶ 40.) Regarding the sign postings, plaintiff testified that she possibly recalled sending Baum a thank you letter for his prompt attention to her request. (*See* Pl.'s Opp'n Ex. 1 at 86.) Where plaintiff took actions into her own hands, attempting to create a handicapped parking spot in its former location by either cutting the ribbons to the cordoned off spots or making her own spot next to the handicapped ones, the District did not discipline plaintiff or prevent her from doing so. (*See* Def.'s 56.1 ¶ 44.)

A review of the uncontroverted evidence in the record, including plaintiff's testimony, shows that defendant engaged in an interactive process with her when trying to provide her with the requested accommodations. *See Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) ("The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated.") At least one circuit court has described possible actions that might

reflect an interactive process: "meet[ing] with the employee who requests an accommodation request, request[ing] information about the condition and what limitations the employee has, ask[ing] the employee what he or she specifically wants, show[ing] some sign of having considered [the] employee's request, and offer[ing] and discuss[ing] available alternatives when the request is too burdensome." *Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142, 162 (3d Cir. 1999). The aforementioned evidence shows just this: defendant meeting with plaintiff, listening to her concerns, and taking actions that reflected its having considered her request, whether by having Owen speak with Grillo concerning the location of the handicapped spots, or by having signs immediately erected to clearly identify those spots reserved for handicapped parking permitted individuals. Moreover, it is not as though defendant denied plaintiff a handicapped parking space – it was made clear to her that she was free to park in the moved handicapped parking spaces at all times during construction. Plaintiff chose not to avail herself of these parking spaces. Although plaintiff contends that no accommodation was made because her former handicapped parking space was not restored to her during that time, the Court fails to see how the District reasonably could have taken such action, given that the entire section of the building in which plaintiff's prior parking space was located was under construction at the time. Had defendant chosen to accommodate plaintiff in the manner she requested, it would have been exposing her to a hazardous situation – namely, an active construction site with a potentially unsafe pathway to the school. These are the precise concerns plaintiff claims to have voiced to the District on several occasions for purposes of giving it notice of her disability; she cannot now contend that it was

unreasonable of the District to have failed to have taken these considerations and needs into account when she requested a parking space amidst a construction site.    In fact, other than parking within the hazardous construction site (which was not an option for obvious reasons), plaintiff has failed to identify any other accommodation that she did request (or even could have requested) of the District. Thus, summary judgment on this claim is warranted.

In *Trepka v. Board of Education*, the Sixth Circuit reached the same conclusion in analogous circumstances. 28 F. App'x 455 (6th Cir. 2002). Specifically, the plaintiff school teacher claimed that the school board had failed to make a reasonable accommodation to her alleged permanent disability – which caused permanent pain to her back and neck and made it difficult to climb stairs and carry oversized loads – by denying her a room closer to where she parked her car. *Id.* at 460. However, the Sixth Circuit found summary judgment on that claim was proper because, *inter alia*, "[t]he only relevant difference between the requested Room 108 and her assigned Room 104 is the distance that [plaintiff] would be required to navigate inside the building from her car" and plaintiff "presented no evidence that her condition limited her ability to walk." *Id.* The Sixth Circuit also rejected the related claim that she was not provided with adequate handicapped parking. *Id.* In particular, the court noted that "[a]bsent any evidence of more profound physical limitations arising from her condition, we hold that [plaintiff] has not demonstrated a genuine issue of material fact as to whether her parking needs were reasonably accommodated." *Id*.

In sum, even construing the evidence most favorably to plaintiff, no rational jury could find that the District failed to reasonably accommodate plaintiff or to engage in an interactive process with her concerning her requests. Instead, based on the uncontroverted evidence, including plaintiff's own testimony, the Court concludes that summary judgment is warranted on the question of whether defendants reasonably accommodated plaintiff's accommodation requests.

## B.  Retaliation Claim[10]

Plaintiff also claims that defendant retaliated against her repeated requests for accommodation (*i.e.*, replacement of her former handicapped parking space) when it decided to terminate her in November 2010. (*See* Pl.'s Opp'n at 12-20.) In particular, plaintiff claims that she (1) engaged in protected activity, namely, repeated complaints, (2) of which the District was aware, (3) and suffered an adverse employment action (specifically, termination) which (4) had a causal connection with her protected activity. *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) (setting forth the prima facie standard for retaliation). Defendant counters that plaintiff cannot show engagement in a protected activity, and even if she can, she cannot establish a causal connection between the alleged protected activity and the adverse action. (*See* Def.'s Summ. J. Mot. at 20-23.) Generally, a plaintiff's burden at the summary judgment stage is "'minimal' and

---

[10] Although this Court has determined that plaintiff cannot demonstrate that she was disabled during the relevant period because of a lack of evidence, that conclusion does not preclude a claim of retaliation. "[C]ourts generally have recognized that non-disabled individuals who request reasonable accommodation are protected against retaliation, provided the request was made in good faith." *Keating v. Gaffney*, 182 F. Supp. 2d 278, 288 (E.D.N.Y. 2001) (citing *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 233 (2d Cir. 2000)).

'*de minimis*'"; thus, "the court's role . . . is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). The Court begins its analysis with the applicable legal framework.

Retaliation claims brought under the ADA are examined under the *McDonnell Douglas* burden-shifting test. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Heyman*, 198 F.3d at 72. Pursuant to this test, a plaintiff first must set forth a prima facie case of retaliation. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010). That is, the plaintiff must show "[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)) (internal quotation marks omitted). If the plaintiff is able to establish a prima facie case of discrimination, the burden then shifts to the defendant to set forth "some legitimate, nondiscriminatory reason" for the complained-of conduct. *McDonnell Douglas*, 411 U.S. at 802; *see also Fincher*, 604 F.3d at 720 (stating that where the plaintiff succeeds in establishing a prima facie case, "then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory"). Where the defendant articulates such a reason, the burden shifts back to plaintiff to establish that "but for the protected activity, [she] would not have been terminated." *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625(MKB), 2013 WL 3968748, at *14 (E.D.N.Y. July

30, 2013); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) (stating that a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer").

Subsequent to briefing in this case, the Supreme Court modified the standard for employment discrimination in *University of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 1517 (2013). In this decision, the Supreme Court set forth a higher standard for plaintiffs seeking to establish a retaliation claim under Title VII. In particular, the Supreme Court held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m)" of Title VII. *Id.* at 2533; *see also Brooks v. D.C. 9 Painters Union*, No. 10-CV-7800 (JPO), 2013 WL 3328044, at *4 (S.D.N.Y. July 2, 2013) ("If the defendant [articulates a legitimate, non-retaliatory reason], the plaintiff must offer 'proof that the unlawful retaliation would have occurred in the absence of the alleged wrongful action or actions of the employer.'" (quoting *Nassar*, 133 S. Ct. at 2534)).

For the reasons set forth below, the Court concludes that, even if plaintiff can establish a prima facie case of retaliation, her claim must fail because no rational jury could find that her termination was a pretext for retaliation. In other words, even accepting all of plaintiff's evidence as true and construing it in her favor, no rational jury could find that but for her handicapped parking requests, she would not have been terminated.

1.   Prima Facie Case

a.   Protected Activity

Plaintiff asserts that she engaged in protected activity when she complained about the "remov[al]" of her handicapped parking space, requesting that it be returned. (Pl.'s Opp'n at 12.) Defendant disagrees, arguing that plaintiff's handicapped parking requests do not constitute protected activity as she "has produced no evidence of any complaint, formal or informal, sufficient to place the defendant on notice that she was referring to discriminatory activity." (Def.'s Summ. J. Mot. at 20.) In particular, defendant challenges the notion that plaintiff's "generalized complaints about the inconvenience caused by disruption of the parking lot during construction" were sufficient to have alerted the District to a disability, "particularly given the fact that plaintiff [] never advised anyone at the district that she had a disability." (*Id.* at 21.) In responding to defendant's arguments, plaintiff notes that she "did not specifically complain of discrimination" when raising her complaints. (Pl.'s Opp'n at 13.)

The Court is not persuaded that plaintiff's complaints concerning the handicapped parking spaces are a clear-cut protected activity of which the District was aware. *See Cook v. CBS, Inc.*, 47 F. App'x 594, 596 (2d Cir. 2002) (concluding that plaintiff did not engage in protected activity where plaintiff sent a letter "request[ing] additional training and reassignment without ever mentioning, or even alluding to, [plaintiff's] belief that [defendant's] failure to comply with his requests would constitute unlawful discrimination"); *Foster v. Humane Soc. of Rochester & Monroe Cnty., Inc.*, 724 F. Supp. 2d 382, 395 (W.D.N.Y. 2010) (concluding that plaintiff's allegations and supporting documents did not show that plaintiff engaged in protected activity, but

instead showed "that while [plaintiff] did complain about certain problems she was having at work, she did not complain that she was being discriminated against").

However, the Court need not resolve this issue. In particular, even if plaintiff's complaints, concerning the movement of handicapped parking spaces due to construction, may be construed as participation in protected activity of which defendant was aware, plaintiff's retaliation claim still fails for the reasons set forth *infra*.

b.   Adverse Employment Action

Plaintiff satisfies the adverse employment action prong of her prima facie case. The uncontroverted evidence in the record shows that plaintiff was, in fact, terminated. "Being fired is an adverse employment action." *Moore*, 2013 WL 3968748, at *18; *see also Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004) ("[Plaintiff] suffered an adverse employment action when he was fired."). The evidence also shows that, prior to her termination, plaintiff's job responsibilities changed; that is, she lost her job coaching privileges and was reassigned to the library. (*See* Def.'s 56.1 ¶ 52.) According to plaintiff, this constituted a less prestigious position, although she did receive the same benefits and salary. The Court need not conclude whether the library reassignment, standing alone, constituted an adverse employment action, as plaintiff's termination is sufficient here for purposes of satisfying the adverse action prong of her retaliation claim. *See Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010) (noting that "typical examples of actionable adverse employment actions include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly

diminished material responsibilities'" (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)); *Reynoso v. All Foods, Inc.*, 908 F. Supp. 2d 330, 342 (E.D.N.Y. 2012) (stating that plaintiff's "termination clearly constitutes an adverse employment action").

### c.   Causal Connection

Assuming *arguendo* that plaintiff can show that she engaged in protected activity, and further, that defendant was aware of such protected-activity-participation, plaintiff cannot establish a causal connection between her alleged protected activity and her termination. "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)) (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) ("We have held that a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation."). Although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman–Bakos*, 252 F.3d at 554, some district courts have generally concluded that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line," *Cunningham v. Consol. Edison, Inc.*, No. 03–CV–3522 (CPS), 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (collecting cases); *see also Hollander*

*v. Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (concluding that a three-and-a-half month interview was too much time to establish causation without other probative evidence); *Browne v. City of N.Y.*, 419 F. Supp. 2d 315, 336 (E.D.N.Y. 2005) (concluding that there was no causal connection where challenged adverse action occurred nearly six months after plaintiff filed internal complaint). However, because the Second Circuit has found periods well beyond two months to be sufficient to suggest a causal relationship under certain circumstances, courts must carefully consider the time lapse in light of the entire record. *See, e.g., Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980) (eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship); *see also Richardson v. N.Y.S. Dep't of Corr. Servs.*, 180 F.3d 426, 446–47 (2d Cir.1999), *abrogated on other grounds, Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier).

Here, plaintiff alleges that she first complained in March 2009 about the inaccessibility of the handicapped parking spaces in March 2009 due to the construction at the school. (*See* Compl. ¶¶ 18-22.) Plaintiff does generally assert that she continued to complain about the parking throughout the 2009-10 academic year. (See Compl. ¶¶ 24-27.) Therefore, in the instant case, because her termination was not recommended until November 2010 – which was over eighteen months after her first complaint in March 2009, and at least four months after her last complaint at the end of the 2009-10 academic year – no causal connection can be inferred based upon

temporal proximity.[11] The Court recognizes that, if the adverse action had been taken at the first opportunity after the protected activity, an inference of causation could have been drawn, notwithstanding the passage of a longer period of time between the protected activity and the adverse action. *See Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 125-26 (2d Cir. 2012). However, that is not the case here. It is undisputed that plaintiff was a probationary employee and, thus, defendant could have terminated her employment at any time, including at the end of the 2009-2010 academic year. Thus, the fact that she was not terminated before the

commencement of the 2010-2011 academic year negates any inference of causation from the timing of the relevant events. In any event, even assuming *arguendo* that plaintiff can establish temporal proximity and can satisfy the elements of a prima facie case, her claim still cannot survive summary judgment because, as discussed below, in the wake of defendant's articulated non-discriminatory reason, plaintiff has no evidence from which a rational jury could find such reason to be a pretext for retaliation.

### 2. Legitimate, Non-Discriminatory Reason for Retaliatory Act

As previously set forth, "[o]nce a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (quoting *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)) (internal quotation marks omitted). Defendant here has satisfied that burden.

Defendant's proffered reasons for terminating plaintiff were that plaintiff was a probationary employee; she was therefore subject to observation and evaluation before any change in a position title could occur; the superintendent had clearly articulated that if any concerns arose concerning an employee, he would not support a tenure recommendation; and concerns did arise concerning plaintiff's performance. (*See* Def.'s Summ. J. Mot. at 23.) Specifically, complaints surfaced concerning plaintiff's treatment of both a student and staff members at St. Charles Hospital, where plaintiff held job coaching responsibilities. (*Id.* at 23-24.) While it seems that the complaints concerning plaintiff's treatment of an autistic child at the hospital largely underlay defendant's termination decision,

---

[11] Plaintiff also notes – for the first time, in her opposition papers – that she complained in summer 2010, without providing any additional information, details, or context concerning the complaint. (*See* Pl.'s Opp'n at 14.) In response, defendant argues: "The federal complaint, which goes on for paragraphs about plaintiff's complaints to the District, does not reference a complaint in summer 2010; the last complaint referenced is during the 2009-2010 academic year when plaintiff alleges Dr. Baum screamed and gestured at her (Ex. A ¶ 27). Similarly, when questioned at length at her deposition about the contents of any and all complaints she made, Graham did not note any complaints beyond the 2009-10 school year. Now, however, in an attempt to stave off summary judgment, plaintiff makes reference to a complaint in the summer of 2010, without providing any further information about the content of the complaint, who she complained to, the date of the complaint, or how the complaint was made." (Def.'s Reply at 9 n.2.) The Court agrees with defendant that plaintiff is not permitted to introduce evidence for the first time in her opposition for summary judgment, especially where such evidence is inconsistent with her detailed allegations in the complaint. *See Morritt v. Stryker Corp.*, No. 07–CV–2319, 2011 WL 3876960, at *5–8 (E.D.N.Y. Sept. 1, 2011) (holding that a party may not submit evidence for the first time in connection with their opposition to a summary judgment motion). In any event, as discussed *infra* here, even if such evidence is considered and could be used to establish temporal proximity, such evidence alone is insufficient for plaintiff's claim to survive summary judgment.

defendant also states that there was a prior complaint concerning plaintiff's conduct dating from the 2005-2006 school year. (*Id.* at 24.) Additionally, defendant notes that plaintiff was not the only CTA to be denied tenure; instead, approximately eleven other CTAs were recommended for termination. (*Id.* at 23 (citing Def.'s Summ. J. Mot. Ex. L).)

Here, plaintiff was a probationary employee who could have been fired at any point in time and for no stated reason during her period of employment. *See Matter of Rossetti-Boerner v. Hampton Bays Union Free Sch. Dist.*, 1 A.D.3d 367, 368 (2d Dep't 2003) ("It is well settled that a probationary employee may be discharged without a hearing and without a statement of reason in the absence of any demonstration that dismissal was for a constitutionally-impermissible purpose or in violation of statutory or decisional law."). Moreover, plaintiff had at least two recent complaints against her around the time she was up for tenure. The superintendent had notified District employees that he would not support a tenure recommendation for an employee with concerns surrounding his or her performance. This is precisely what plaintiff had on her record at the time she was being considered for tenure. Additionally, the uncontroverted evidence in the record shows that defendant was terminated soon after the complaint from St. Charles Hospital was received, as the St. Charles Hospital complaint is from October 28, 2010, and plaintiff received notice of the termination recommendation in November 2010. For these reasons, the Court concludes that defendant has set forth a legitimate, non-discriminatory reason for its actions, and the burden, accordingly, shifts back to plaintiff to provide evidence from which a rational jury could find pretext.

3.  Pretext

As previously set forth, under the Supreme Court's revised standard for retaliation claims, plaintiff must show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533. Thus, plaintiff here "must show that retaliation was a but-for cause of the adverse employment action." *Moore*, 2013 WL 3968748, at *19; *see also Brooks*, 2013 WL 3328044, at *3 (stating that plaintiff had to show that alleged age discrimination "was the 'but-for' cause of the adverse action and not merely one of the motivating factors"). To satisfy this but-for causation element, plaintiff must "prove that [her] termination would not have occurred in the absence of a retaliatory motive." *Moore*, 2013 WL 3968748, at *20.

Plaintiff cannot show, nor does the uncontroverted evidence in the record support the conclusion, that plaintiff would not otherwise have been terminated in the absence of her handicapped parking complaints and defendant's denial of the same. The record shows that plaintiff was terminated soon after a serious complaint came to the District's attention concerning plaintiff's inappropriate treatment of an autistic student while on-the-job. The uncontroverted evidence also reflects the seriousness with which the District treated the complaint, passing it up the chain of command while investigations were ongoing until it reached the superintendent himself. The record also shows that plaintiff's record prior to termination included an additional complaint concerning her treatment of staff at the St. Charles Hospital. Lastly, it is undisputed that plaintiff was a probationary employee prior to her termination, giving the District the freedom to terminate her at any point in time and for no stated reason. In the face of these uncontroverted facts,

plaintiff has failed to provide any evidence from which a rational jury could find that, but for her alleged acts of protected activity – in the form of complaining about the movement of the handicapped spaces during construction and requesting restoration of her same parking spot – plaintiff would not have been fired. Indeed, as noted above, the uncontroverted evidence suggests the exact opposite, especially given that plaintiff seems to have first begun complaining about the parking spaces in fall 2009, and she was terminated well over a year following the complaints' commencement. For these reasons, the Court concludes that plaintiff has failed to establish that defendant's decision to terminate her was a pretext for retaliation. Accordingly, the Court grants defendant's motion for summary judgment in its entirety.

## C.  ADA Disability Claim Regarding Termination

Although plaintiff made a conclusory claim in the complaint that the termination (in addition to being retaliatory) was on account of her disability, it is unclear from the opposition papers whether plaintiff is continuing to make that assertion. Specifically, in her brief, plaintiff submits that the issues are: "(1) whether Plaintiff is disabled under the ADA; (2) whether Defendant was aware of Plaintiff's disability; (3) whether Plaintiff requested reasonable accommodations from Defendant; and (4) whether Plaintiff was retaliated against by Defendant for engaging in protected activities." (Pl.'s Opp. at 1.) There is no mention of a disputed issue as to whether plaintiff's termination was because of her alleged disability (as opposed to in retaliation for her alleged requests for accommodation). In fact, although there is a detailed analysis in plaintiff's opposition as to why she contends that her termination was retaliatory (*see* Pl.'s Opp'n at 12-20),

there is no such analysis for any separate claim of termination because of the disability. In fact, aside from a cursory citation to the legal standard for a discriminatory discharge claim (*see id.* at 7), the only conclusory reference at all to such a contention is in the retaliation section (*see id.* at 15), which cites a paragraph of Plaintiff's 56.1 Statement that only makes reference to the termination being a pretext for retaliation (*see* Pl.'s 56.1 ¶ 53 ("Thus, it is apparent the District used the complaint against Plaintiff as a pretext to terminate her employment.")). Thus, any separate ADA claim for termination based upon the disability (as opposed to retaliation) could be deemed to have been abandoned. However, in an abundance of caution, the Court has separately examined any such claim and concludes that, even assuming *arguendo* that plaintiff has evidence to satisfy a prima facie case, the claim would still fail for the reasons discussed below.

For purposes of a discriminatory discharge claim, an employee must show that: "(1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation; and (4) she was fired because of her disability." *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869-70 (2d Cir. 1998). Of course, this claim is also subject to analysis under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas*. *See McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (applying *McDonnell Douglas* standard to disability discrimination claim brought under the ADA). The Court assumes, for purposes of this motion, that plaintiff can establish a

28

prima facie case.[12] As discussed in detail in connection with the retaliation claim,

defendant has articulated a non-discriminatory reason for the termination – namely, job performance – and, based on the Court's review of the uncontroverted evidence in the record, no rational jury could find that the reason given for plaintiff's termination was a pretext for her alleged disability. *See Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 259 ("To satisfy [plaintiff's] burden on the fourth prong of her prima facie claim, [plaintiff] must show that she was terminated under circumstances that give rise to an inference of discriminatory intent." (emphasis omitted)).

First, as noted *supra*, it is undisputed that plaintiff was a probationary employee during the period of employment relative to the Court's analysis. She, therefore, could have been fired at any time and for any reason, as long as it was not for an impermissible purpose. *See Matter of Rossetti-Boerner*, 1 A.D.3d at 368 ("It is well settled that a probationary employee may be discharged without a hearing and without a statement of reason in the absence of any demonstration that dismissal was for a constitutionally-impermissible purpose or in violation of statutory or decisional law.").

Additionally, a plaintiff also is not required to "show that the employer had a reasonable basis for perceiving [her] as suffering from a disability; [the statute] merely requires [her] to show that the employer did so perceive [her]." *Davis*, 2012 WL 139255, at *5; *see also Jordan v. Forfeiture Support Assocs.*, No. 11-CV-3001, 2013 WL 828496, at *16 (E.D.N.Y. Mar. 5, 2013). Lastly, the ADAAA makes clear that the "regarded as" definition of disability "does not apply to impairments that are both transitory and minor." *Davis*, 2012 WL 139255, at *5 (citing 42 U.S.C. § 12102(3)(B)).

However, the Court need not address this issue in this case because, as discussed below, even if plaintiff were disabled or regarded as disabled, this claim cannot survive summary judgment because no rational jury could find that the termination was a pretext for disability discrimination given the uncontroverted evidence in the record.

---

[12]   The Court notes that, for a disability discrimination claim, the "regarded as" theory of disability would be available to plaintiff (unlike for her reasonable accommodation claim). The Court briefly addresses this third definition of a disability.

The ADAAA has dramatically expanded the definition of "regarded as" disabled. In particular, pre-ADAAA, a plaintiff who alleged that she was "regarded as" having a disability had to show that the perceived disability was one that "substantially limited a major life activity." *Joseph*, 2011 WL 573582, at *9; *see also Cody*, 577 F. Supp. 2d at 643 (setting forth pre-ADAAA standard, stating that "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action," but "[r]ather, [p]laintiff must demonstrate that defendants perceived [her] impairment as substantially limiting the exercise of a major life activity" (alteration in original) (internal citations and quotation marks omitted)).

Post-ADAAA, however, there is "a new, more lenient, standard for determining whether an individual is 'regarded as disabled': [a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental or impairment *whether or not the impairment limits or is perceived to limit a major life activity*." *Davis v. N.Y.C. Dep't of Educ.*, No. 10-CV-3812 (KAM)(LB), 2012 WL 139255, at *5 (E.D.N.Y. Jan. 18, 2012) (quoting *Laurent v. G&G Bus Serv., Inc.*, No. 10-cv-4055, 2011 WL 2683201, at *5 (S.D.N.Y. May 17, 2011)) (internal quotation marks omitted); *see also Nelson v. City of N.Y.*, No. 11-CV-2732(JPO), 2013 WL 4437224, at *7 (Aug. 19, 2013) (same); *George v. TJX Cos., Inc.*, No. 08-CV-275(ARR)(LB), 2009 WL 4718840, at *8 (E.D.N.Y. Dec. 9, 2009) ("[T]he ADAAA dramatically expanded the reach of the ADA by protecting individuals who are 'regarded as' having a disabling impairment even when the impairment neither is, nor is perceived to be, substantially limiting."). Under this more relaxed standard, an employee need not "show that the disability [s]he is perceived as suffering from is one that actually limits, or is perceived to limit, a major life activity." *Darcy v. City of N.Y.*, No. 06-CV-2246 (RJD), 2011 WL 841375, at *4 (E.D.N.Y. Mar. 8, 2011).

Additionally, at the time of plaintiff's consideration for tenure, it is uncontroverted that she had at least two complaints against her. The superintendent had notified District employees that he would not support a tenure recommendation for an employee with concerns surrounding his or her performance. Unfortunately for plaintiff, this is precisely what she had on her record – and more than once – at the time she was being considered for tenure.

Moreover, plaintiff points to nothing in the record from which a rational jury could find her termination was "because of" her hip impairment, or that the District's underlying motive to terminate her was attributable to a discriminatory intent, and not to her job performance. Instead, plaintiff only offers conclusory allegations that are devoid of any factual support. A review of the record shows that there is no evidence that the District harbored any type of discriminatory intent against her. In fact, there is uncontroverted evidence that defendant made efforts to accommodate plaintiff's requests, to tend to her complaints, to overlook where she took matters into her own hands (*e.g.*, cutting the ribbons roping off the construction site), and to explain why – if a request were made that could not be granted – it was being denied.[13] Indeed, it was not until significant concerns arose (and quickly went up the relevant chain of command to the superintendent) concerning plaintiff's performance abilities

that plaintiff began to experience the alleged adverse employment actions at issue, including her termination.

In addition, there is uncontroverted evidence that plaintiff was not the only employee who was denied tenure at the conclusion of her probationary period. (*See* Def.'s Summ. J. Mot. at 23 (citing *id.* Ex. L.) In fact, approximately ten other certified teaching assistants were terminated, and a number of non-disabled CTAs (thirty-two in total) were given JUUL agreements, having their probationary period extended (but their tenure determination delayed) (*see id.* at 23). While not a dispositive factor, this evidence also supports defendant's position.

Finally, although there is no dispute that an administrator at St. Charles contacted defendant to complain that plaintiff was very demeaning to a special education student, plaintiff attempts to attack the merits of the complaint by the St. Charles administrator. However, plaintiff's arguments raise issue only as to the accuracy or the wisdom of defendants' decision to terminate plaintiff, but fail to create a triable issue of fact as to whether the proffered reasons for plaintiff's termination were a pretext for discrimination. The question in any discrimination case is not whether defendant's decision to fire plaintiff was correct, but whether it was discriminatory. *See, e.g., McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what 'motivated the employer . . . .'" (emphasis omitted) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983))); *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009) ("Where a plaintiff has been terminated for misconduct, the question is not 'whether the employer

---

[13] Regarding this last point, it is clear that, contrary to plaintiff's framing of the facts, the District never denied her a handicapped parking space during the construction period. Instead, it allowed her to continue using her handicapped parking pass; it simply required her to park in the new handicapped spaces, which had been located in a different area to ensure employee safety and minimize the risk of employee injury during the construction period, issues which were clearly of import to plaintiff, given the substance of her complaints.

reached a correct conclusion in attributing fault [to the plaintiff] . . ., but whether the employer made a good-faith business determination.'" (quoting *Baur v. Rosenberg, Minc, Falkoff & Wolff*, No. 07–CV–8835 (GEL), 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008))); *Agugliaro v. Brooks Bros*., *Inc*., 927 F. Supp. 741, 747 (S.D.N.Y. 1996) ("Even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status.").

In sum, even construing the evidence most favorably to plaintiff, there is no evidence from which a rational jury could find that the District's actions here were motivated by a discriminatory intent against plaintiff and her alleged disability. Accordingly, to the extent this claim was not abandoned, summary judgment as to this claim is also granted.

### IV. CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted in its entirety. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:  September 30, 2013
          Central Islip, New York

*     *     *

Plaintiff is represented by Rick Ostrove,

Brandon David Okano, David H. Rosenberg, and Thomas Ricotta of Leeds Brown Law, P.C., One Old Country Road, Carle Place, New York 11514, and by Gregory Nicholas Filosa of The Ottinger Firm, P.C., 20 West 55th Street, 6th Floor, New York, NY 10019.  Defendant is represented by Jeltje DeJong, Kelly E. Wright, and David S. Shteierman of Devitt Spellman Barrett, LLP, 50 Route 11, Smithtown, NY 11787.